929 F.2d 701
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Kim Lamont MILES, Petitioner-Appellant,
v.
John JABE, Respondent-Appellee.
 No. 90-1659.
 United States Court of Appeals, Sixth Circuit.
 April 1, 1991.
 
 On Appeal from the United States District Court for the Eastern District of Michigan, 89-7222, Sukrheinrich, J.
 E.D.Mich.
 AFFIRMED.
 Before KEITH and BOYCE F. MARTIN, Jr., Circuit Judges; and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Kim Lamont Miles appeals the district court's denial of his petition for a writ of habeas corpus. For the following reasons, we affirm the district court's opinion and order.
 
 I.
 
 2
 At approximately 5:00 a.m. on July 31, 1983, a man broke into the house (by prying open a bedroom window screen) that Robert Gavin ("Gavin") and Dr. Mary Such ("Dr. Such") (collectively the "victims") shared in Ann Arbor, Michigan. Gavin woke to see the intruder at the foot of the bed bending over a desk directly beneath the open bedroom window. Thinking that the intruder was Dr. Such, Gavin called out her name not realizing that Dr. Such was still in bed next to him. The intruder immediately approached the bed and ordered Gavin and Dr. Such to remain quiet. Gavin noted that the intruder carrier a revolver in his pants and a hunting knife in his hand.
 
 
 3
 After demanding money, the intruder ordered Gavin and Dr. Such to undress "for security purposes." Gavin and Dr. Such reluctantly cooperated. After ordering Gavin to lay face down on the bed, the intruder ordered Dr. Such to sit on Gavin's back and perform oral sex on him (the intruder). The intruder then withdrew his penis from Dr. Such's mouth and inserted it into Dr. Such's vagina for a "minute or two." Transcript of Dr. Such's Testimony at 62. The intruder then stated his intention to leave and ordered Dr. Such (still naked) to accompany him "for security reasons" to a nearby park.
 
 
 4
 Once in the park, the intruder forced Dr. Such to lay face down on the ground and "stuck his fingers in [Dr. Such's] rectum and said, isn't this humiliating, isn't this the most humiliating thing that's ever happened to you?" Id. at 66-67. Though the intruder repeatedly threatened to kill Dr. Such, the intruder ultimately allowed her to run home.
 
 
 5
 The Ann Arbor police arrived at the victims' house shortly thereafter. While processing the crime scene for fingerprints, Police Detective Mary Smith discovered a latent palm print on top of the bedroom desk. Because the intruder had not ejaculated during intercourse, an examining gynecologist was unable to find a semen trace in Dr. Such's vagina.
 
 
 6
 Petitioner-appellant Kim Lamont Miles ("Miles" or "petitioner-appellant") was arrested on October 20, 1983, following an unrelated sexual assault. Miles' fingerprints and palm prints were taken at this time. Michigan State Police Detective Harry Reed, a fingerprint specialist, compared Miles' palm print with the print obtained from the victims' desk and concluded that the prints matched.
 
 
 7
 Though the petitioner-appellant denied any involvement in Dr. Such's sexual assault, the following exchange occurred during Miles' trial:
 
 
 8
 [Defense Attorney]: A house has been described during the course of this trial, the house that Dr. Such and Mr. Gavin live in, have you ever had any contact with that house?
 
 
 9
 [Miles]: I don't know if that's the house, but I have had contact with a house in the area, yes.
 
 
 10
 .............................................................
 
 
 11
 ...................
 
 
 12
 * * *
 
 
 13
 [Defense Attorney]: When you say you had contact with the house, what do you mean?
 
 
 14
 [Miles]: I broke into the house.
 
 
 15
 [Defense Attorney]: And when you say you broke into the house, what did you do?
 
 
 16
 [Miles]: Well, I took this screen like this and took a quarter and pried the screen loose and crawled up in the house.
 
 
 17
 .............................................................
 
 
 18
 ...................
 
 
 19
 * * *
 
 
 20
 [Defense Attorney]: When you went into the house, did you have any gloves on?
 
 
 21
 [Miles]: No, I did not.
 
 
 22
 [Defense Attorney]: Immediately upon going inside of the window, what, if anything, was there?
 
 
 23
 [Miles]: I thought it was a dresser or something. I didn't really take notice to what it was because right after I got into the house--
 
 
 24
 [Defense Attorney]: (Interposing) When you went into the house, did you intend to steal something in the house?
 
 
 25
 [Miles]: No, I didn't intend to steal because it was still kind of light and I could be seen.
 
 
 26
 [Defense Attorney]: Why then were you going into the house?
 
 
 27
 [Miles]: Because some people was in the market for stereo equipment.
 
 
 28
 .............................................................
 
 
 29
 ...................
 
 
 30
 * * *
 
 
 31
 [Defense Attorney]: When you say that you were not going to steal anything, but you also said that you were looking for stereo equipment, what do you mean?
 
 
 32
 [Miles]: Well, because of some other people I know, I contact them and let them know where a place is and they will go in and get the equipment that I describe to them and the place where it's located.
 
 
 33
 Transcript of Kim Miles' Testimony at 5-8.
 
 
 34
 On February 3, 1984, the Washtenaw County Circuit Court jury found Miles guilty of first degree criminal sexual conduct (two counts) and armed robbery (two counts). On March 15, 1984, the trial court sentenced Miles to four concurrent life terms. On June 19, 1986, the Michigan Court of Appeals affirmed Miles' conviction and sentence. The Court of Appeals denied Miles' motion for rehearing on August 21, 1986, though Miles claims that he did not receive a copy of the order until approximately February 4, 1987. The Michigan Supreme Court rejected Miles' "Delayed Application for Leave to Appeal" on February 26, 1987 (and again on April 14, 1987) as untimely. On December 8, 1987, the Washtenaw County Circuit Court denied Miles' "Delayed Motion for New Trial." The Michigan Court of Appeals rejected Miles' "Application for Leave to Appeal the Delayed Motion for New Trial" on July 28, 1988. On February 1, 1989, the Michigan Supreme Court denied Miles' "Delayed Application for Leave to Appeal."
 
 
 35
 Miles filed a petition for writ of habeas corpus in the United States District Court for the Eastern District of Michigan on July 21, 1989. On May 4, 1990, District Court Judge Suhrheinrich denied Miles' petition. Miles thereafter filed a timely notice of appeal.[1]
 
 II.
 A.
 
 36
 While testifying at the petitioner-appellant's trial, both victims identified Miles as the assailant. Miles now challenges the admissibility of these identifications because convictions based on in-court identifications may be set aside if the pre-trial identification procedures used were so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968).
 
 
 37
 Though the victims attempted to identify the assailant following the crimes, Gavin and Dr. Such were not able to select Miles' picture from an array of photographs they were shown. In fact, the victims' first opportunity to observe the petitioner-appellant occurred at the preliminary examination (after being informed that Miles' palm print matched the print found in their bedroom) where Miles "was the only young black man in the courtroom and was clearly treated as the criminal defendant." District Court's May 4, 1990 Memorandum Opinion and Order at 8. Miles argues that, in light of the overly suggestive pre-trial identification, the trial court should have suppressed the victims' in-court identification because the trial court never conducted an evidentiary hearing to determine if the victims had an independent basis to support their identifications at trial.
 
 
 38
 Though the district court (and the Michigan Court of Appeals) found the victims' identification at the preliminary examination to be impermissibly suggestive, the district court determined that "the weight of the other evidence rendered the faulty pretrial identification harmless." District Court's May 4, 1990 Memorandum Opinion and Order at 9. We agree.
 
 
 39
 Though the circumstances surrounding Miles' pretrial identification were overly suggestive, " '[a] defendant is denied due process only when the identification evidence is so unreliable that its introduction renders a trial unfair. As long as there is not a substantial likelihood of misidentification, it is the function of the jury to determine the ultimate weight to be given the identification.' " Smith v. Perini, 723 F.2d 478, 482 (6th Cir.1983) (citations omitted), cert. denied, 466 U.S. 941 (1984). In Neil v. Biggers, 409 U.S. 188 (1972), the Supreme Court announced five factors to be considered when determining whether, under the totality of the circumstances, an identification is reliable though the confrontation was suggestive: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description; (4) the witness' certainty; and (5) the length of time between the crime and the confrontation. Id. at 199-200.
 
 
 40
 Less than three months after the robbery and sexual assault, Gavin and Dr. Such positively identified Miles (without hesitation or equivocation) as the assailant at the preliminary examination. In fact, after noting that she had stared at Miles under the streetlight in front of her house for six to ten seconds as they exited her home, Dr. Such testified regarding her determination to memorize the assailant's features and characteristics:
 
 
 41
 He was--the thing that struck me when I was going on the way to the park, I decided that I better take a good look at him, because up to that point I was rather repulsed by the whole thing.... The thing that I noticed about him was that he had what we call in dentistry a class one profile. He didn't have a real big chin; he didn't have a real small chin. He had what we consider a balanced face, a rather pleasing profile, if you may. He wasn't way out of occlusion. His lower jaw was not large, real large, or real recessive. And he, you know, like I told Detective Smith, he was not--he wasn't ugly, you know; he was not a, you know--we have something called a F.L.K. Syndrome, a funny looking kid syndrome. He wasn't like that. He had a balanced face.
 
 
 42
 Transcript of Dr. Such's Preliminary Examination Testimony at 19. Moreover, when asked what kind of clothing the assailant wore, Dr. Such described Miles' clothes with a high degree of precision:
 
 
 43
 A baggy--not a painter's pants, but it was, appeared to be dark green pants with many pockets on the legs and on, you know, all over. He was also wearing a dark shirt, a cloth shirt, not a knit, like a work shirt. I believe it was long-sleeved with his sleeves slightly rolled up. I estimated his waist size to be probably about a ... 29 inch waist. I said he had very thin, thin hips. And he was not a large person; he was not a tall person. He wasn't--didn't appear to be stick skinny, but he wasn't, you know, he wasn't--he was a thin person, slender person.
 
 
 44
 Id. at 25-26.
 
 
 45
 Because Dr. Such's professional training as a dentist allowed her to memorize (and characterize) her assailant's features (which she was able to clearly observe under a streetlight), we conclude that Dr. Such's observations (as corroborated by Gavin) rendered the victims' identifications sufficiently reliable, under the totality of the circumstances.
 
 
 46
 Moreover, as previously noted, the Michigan Court of Appeals (and the district court) found any error to be harmless beyond a reasonable doubt:
 
 
 47
 Even if we presume that the complainants' identifications were tainted and improperly admitted at trial, we would be compelled to find the error, if any, harmless beyond a reasonable doubt.
 
 
 48
 At trial, the jury was presented with evidence that defendant's fingerprints matched a palm print obtained from a desk positioned directly under the bedroom window through which the perpetrator of this offense effected entry. The complainants were awakened in their bed at approximately 5:00 a.m. on the morning of the incident by the noise of the perpetrator bending over the desk from which the print was obtained. We are persuaded that the exclusion of complainants' in-court identifications would not be likely to result in a verdict of acquittal, particularly since defense counsel had ample opportunity to and did skillfully cross-examine both complainants as to the weaknesses of their identifications, pointing out the darkness of the early morning hours, their failure to identify defendant from a photographic display and the circumstances of the pretrial identification.
 
 
 49
 People v. Miles, No. 77948, slip op. at 2-3 (Mich.Ct.App. June 19, 1986).
 
 
 50
 In light of the overwhelming evidence presented to the jury, we find any error regarding Miles' in-court identification harmless. See United States v. Martin, 897 F.2d 1368, 1372 (6th Cir.1990) ("Where an error is not of constitutional dimension, it is harmless unless it is more probable than not that the error materially affected the verdict."); Fed.R.Civ.P. 61 ("No error in either the admission or the exclusion of evidence ... is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice."). Miles' first assignment of error is therefore without merit.
 
 B.
 
 51
 Miles argues that his due process rights were violated when the prosecutor made the following statements in his closing argument:
 
 
 52
 "An alibi is easy to prove and hard to disprove."
 
 
 53
 "[The defense attorney] stated that Mr. Miles would have to come in and make an explanation to you. He came in and made that explanation and members of the Jury, if you believe that explanation, you would be candidates to jump off the Brooklyn Bridge."
 
 
 54
 "Members of the jury, [the defense attorney] can transmodify or do whatever he wants with the evidence, but Kim Miles, no matter how you look at it, the defendant is guilty as charged."
 
 
 55
 See Appellant's Brief at 10; Appellee's Brief at 21; District Court's May 4, 1990 Memorandum Opinion and Order at 9-10.
 
 
 56
 Notwithstanding the petitioner-appellant's arguments to the district court, the district court judge denied Miles' assignment of error after noting that "the trial judge instructed the jury on the presumption of innocence, the standard of guilt, arguments of the attorneys, and the prosecutor's burden of disproving any reasonable theory of innocence. Under these circumstances, the comments were not so egregious as to render the trial unfair." District Court's May 4, 1990 Memorandum Opinion and Order at 11.
 
 
 57
 Because the prosecutor's isolated remarks were not "so pronounced and persistent that [they] permeated the entire atmosphere of the trial," United States v. Vance, 871 F.2d 572, 577 (6th Cir.) (quoting United States v. Mahar, 801 F.2d 1477, 1503 (6th Cir.1986)), cert. denied, 110 S.Ct. 323 (1989), Miles' right to a fair trial was not abridged. See Greer v. Miller, 483 U.S. 756 (1987). Accordingly, the district court judge properly denied Miles' prosecutorial misconduct claim. Miles' second assignment of error is therefore rejected.
 
 III.
 
 58
 For the aforementioned reasons, we AFFIRM the district court's May 4, 1990 Memorandum Opinion and Order denying Kim Lamont Miles' petition for a writ of habeas corpus.
 
 
 
 [1]
 Though the appellee argues that the "Petitioner-Appellant's failure to timely file in the Michigan Supreme Court constituted a default barring Petitioner-Appellant from raising his defaulted claims before the federal court in a habeas action," Appellee's Brief at 17, the law supporting the appellee's argument does not appear to be well-settled. In fact, the Supreme Court recently heard arguments regarding whether federal habeas courts may analyze state law, and state court records, to determine whether federal claims are barred by state procedural defaults. See Coleman v. Thompson, 895 F.2d 139 (4th Cir.), cert. granted, 111 S.Ct. 340 (1990). Accordingly, we will ignore any procedural default present in the petitioner's underlying action and address Miles' assignments of error