NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0788n.06
Filed: September 9, 2005

**No. 04-1335**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| FREDERICK GRAYER, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| KENNETH MCKEE, Warden, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |

Before: MOORE and COOK, Circuit Judges; GWIN, District Judge.[*]

COOK, Circuit Judge. Frederick Grayer appeals the district court's dismissal with prejudice of his petition for a writ of habeas corpus. Because the state court did not unreasonably apply clearly established federal law in deciding Grayer's first three claims and because Grayer's fourth claim, though unexhausted, lacks merit, the court affirms.

I

---

[*]The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

1

A Michigan jury convicted Grayer of the carjacking and armed robbery of an elderly woman in a Detroit parking lot. According to the victim, Grayer entered her car at knifepoint, causing her to flee, screaming for help. As the victim escaped, Jane Mencer—the key witness in the case against Grayer—entered the parking lot. Mencer pulled in front of Grayer, attempting to block his car with hers. Grayer, undeterred, went around her and sped off. Mencer gave chase for what she recalled to be "several miles," for "five to seven minutes," before pulling up next to Grayer at a red light. According to Mencer, she then observed Grayer's face and profile for one to two minutes and even, at one point, yelled to him through their open windows, "I know what you did and you're going to be caught, get out." Mencer, realizing that she might be called to identify Grayer, carefully noted his facial features, body build, clothing, and overall appearance. Grayer then drove away and Mencer lost him when he drove onto a highway.

After Grayer's arrest and sometime before trial, Mencer identified Grayer as the carjacker from two photos of Grayer a parole officer showed her. Mencer later observed a live lineup and in "a second" picked Grayer out from among four others as the carjacker. And at trial, she again pointed Grayer out as the carjacker, leading the jury to find Grayer guilty of carjacking and armed robbery.

Grayer appealed his convictions, raising three issues—the photo lineup Mencer viewed was unduly suggestive; the jury instruction concerning the photo lineup was erroneous; and his convictions for both carjacking and armed robbery constituted double jeopardy—all of which the Michigan Court of Appeals rejected. *People v. Grayer*, No. 217954, 2001 WL 740581 (Mich. Ct.

App. Feb. 16, 2001) (per curiam). Grayer then applied for leave to appeal in the Michigan Supreme Court, which that court denied. *People v. Grayer*, 635 N.W.2d 319 (Mich. 2001).

With his direct, state-court avenues closed, Grayer petitioned for federal habeas relief, raising the same three issues he raised before the Michigan state courts, plus an additional *Brady* claim. The district court dismissed the "mixed" petition, because Grayer had not exhausted his *Brady* claim in the state courts. Grayer again petitioned for federal habeas relief, referencing the earlier district court decision and raising "only the issues exhausted by the state." In his amended petition, he also arguably raised a new unexhausted malicious-prosecution claim, alleging that he "should have only been charged with Receiving and Concealing stolen property." The district court considered his three exhausted arguments and rejected them. The district court, however, failed to address Grayer's malicious-prosecution claim. The Sixth Circuit granted a certificate of appealability for all four claims.

II

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), courts review a district court's legal conclusions de novo and its factual findings for clear error. *Vincent v. Seabold*, 226 F.3d 681, 684 (6th Cir. 2000). We will not grant a writ of habeas corpus unless we conclude that the state court's decision: "(1) was contrary to, or involved an unreasonable application of, clearly established Federal law . . . or (2) was based on an unreasonable determination of the facts. . . ." *Armstrong v. Morgan*, 372 F.3d 778, 781 (6th Cir. 2004) (internal quotations and citation omitted).

3

A.  Photo Display

Grayer claims the photos shown to Mencer for purposes of identifying the carjacking

suspect[2] were unduly suggestive, such that they violated his federal due-process rights.  *See Carter*

*v. Bell*, 218 F.3d 581, 605 (6th Cir. 2000).  The Michigan Court of Appeals rejected this argument,

holding that even though the photos were suggestive, the totality of the circumstances showed the

identification to be reliable.  *Grayer*, 2001 WL 740581, at *2-3.  There appears nothing

unreasonable concerning the state court's analysis of the facts of this case and its application of

Supreme Court precedent.

In reviewing a due-process claim involving an identification procedure, the Supreme Court

has adopted a two-part test: (1) the defendant must show the identification procedure was

impermissibly suggestive; and (2) if the procedure was suggestive, the court examines the totality

of the circumstances to determine whether the identification was nonetheless reliable.  *United States*

*v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992) (synthesizing Supreme Court precedent).  In examining

the totality of the circumstances, this court considers several factors, including: "(1) the witness's

opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention at the

time of the crime; (3) the accuracy of the witness's prior description of the defendant; (4) the

witness's level of certainty when identifying the suspect at the confrontation; and (5) the length of

---

[2]A parole officer testified that she showed Mencer two photos of Grayer.  Mencer, however, testified that the officer showed her three or four photos, including two of Grayer.  *See Grayer*, 2001 WL 740581, at *1.  The state court and district court accepted the parole officer's description of the array—the more suggestive of the two.

time that has elapsed between the crime and the confrontation." *Id.* (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).

Here, the Michigan Court of Appeals found the familiar *Biggers* factors demonstrated reliability. That is, Mencer examined Grayer's face for one to two minutes as their cars sat side by side, making a "deliberate effort to observe and remember the description of the driver and his clothing." *Grayer*, 2001 WL 740581, at *2. Mencer consistently described Grayer throughout the proceedings, even articulating "differences that she noticed between defendant's appearance in the photographs, the live lineup, and in court." *Id.* at *3. And a police officer testified that Mencer "was quite adamant" that she could identify Grayer at the live lineup and then did so without hesitation. *Id.*

The state court's application of the *Biggers* factors is not unreasonable, as at least the first, second, fourth, and fifth factors clearly demonstrate a reliable and independent identification.[3] *See United States v. Meyer*, 359 F.3d 820, 825-26 (6th Cir. 2004) (finding weight of first, second, and fourth factors demonstrated reliable identification). Concerning factor one, Mencer had the opportunity to view Grayer's profile and face for one to two minutes at the red light. *See Hill*, 967 F.2d at 232-33 (finding "a couple of minutes" a sufficient opportunity to view the suspect); *Meyer*, 359 F.3d at 825 (finding two to four minutes a sufficient opportunity). Given that during those two

---

[3]This is not to say that factor three necessarily weighs against the reliability of the identification. Under factor three, courts consider the accuracy of the witness's observation. Here, Mencer's description of Grayer suffered from only minor discrepancies—for instance, she testified that he was 5'9"-5'10" tall, when, in fact, Grayer stands at 5'6." Such a difference, however, does not necessarily render an identification unreliable. *See, e.g., Walton v. Lane*, 852 F.2d 268, 274 (7th Cir. 1988) (discounting minor differences concerning suspect's weight and height in assessing accuracy of identification).

minutes, Mencer and Grayer's cars sat next to each other in daylight hours—with the windows open, with Mencer's larger Grand Prix allowing her to look down into Grayer's smaller Dodge Neon (allowing a vantage to view both his face and body), and with Grayer turning his face to Mencer when she spoke to him—Grayer fails to overcome the presumption of factual correctness AEDPA supplies to the court's reliability determination.

The concurrence thinks otherwise, finding the "time of day, the ability to see only the carjacker's profile except for a short frontal view, the distance between the cars, the need to view through another car," all weigh against Mencer's opportunity to observe Grayer. Though the concurrence rightly defers to the state court, under AEDPA, on the ultimate question of whether Mencer's identification was reliable, it largely abandons AEDPA's presumption of factual correctness when assessing Mencer's testimony. That is, under AEDPA, courts presume that factual findings made by the state court are correct, unless the petitioner produces clear and convincing evidence to rebut that presumption. 28 U.S.C. § 2254(e)(1). And when assessing witness credibility, our review becomes even more deferential, as appellate courts are in no position to second guess credibility findings made by the trier-of-fact. *See Seymour v. Walker*, 224 F.3d 542, 551-52 (6th Cir. 2000).

The concurrence, however, resists the § 2254(e)(1) presumption by positing alternatives. For instance, Mencer testified that, though it was 7:45 PM, it was still daylight when she observed Grayer. Yet the concurring opinion, by expressly finding the time of day as hindering Mencer's ability to view Grayer, seems to challenge that testimony without any support from the record. Likewise, though Mencer testified that her car sat higher than Grayer's Neon, allowing her to see

6

Grayer's body and clothing, the concurring opinion devalues that testimony as "implausible" by assuming the two sedans sat at the same height.

The concurrence also posits that Mencer, for most of the chase, "at best," could see the back of Grayer's head. Mencer, however, testified that she was able to view Grayer's face, not only at the red light, but while in pursuit, as their cars drove side by side for a part of the chase.[4] Again, the concurring opinion takes issue with Mencer's testimony, though the trial court labeled her as "very credible". Without any clear and convincing evidence *presented by Grayer or found in the record*, ADEPA review disregards such credibility second-guessing at the appellate level.

Though limited in duration, the opportunity to identify Grayer was, according to the record before us, excellent given Mencer's steadiness under the circumstances together with her heightened degree of attention—considerations relevant under the second *Biggers* factor. According to Mencer, she carefully noted Grayer's face, body build, and overall appearance for the very purpose of identifying him for police. *See Ledbetter v. Edwards*, 35 F.3d 1062, 1072-73 (6th Cir. 1994) (finding reliable identification where witness "devoted her full attention to [suspect's] face as she stared at it from very close range"); *Howard v. Bouchard*, 405 F.3d 459, 473 (6th Cir. 2005) (noting that an interested witness's observation tends to be more reliable than that of a disinterested bystander). Mencer even testified at one point during the proceedings that her father had taught her, as a safety measure, to identify people by observing their noses and eyes—a faculty she relied upon

___

[4]At the *Wade* hearing, the prosecutor asked Mencer: "And so you got a full face view of Mr. Grayer for approximately how long?" She replied: "For at the light it was two or three minutes but prior to that I when I come up to him when he was trying to go out the thing I looked at him also." And Mencer testified, "I was side by side from almost from the time we were going up on Schoolcraft to my right to Evergreen."

in observing Grayer. *See Miles v. Jabe*, No. 90-1659, 1991 WL 43915, at *4 (6th Cir. Apr. 1, 1991) (per curiam) (considering dentist's training in observing facial features).

And Mencer seemingly did not suffer from fear or stress during this incident, as crime victims and witnesses often do. *See United States v. Russell*, 532 F.2d 1063, 1066 (6th Cir. 1976) (noting the potential for a misidentification where observation was made "at a time of stress or excitement"). Rather, Mencer seemed unfazed by Grayer, so much so that she *chased* Grayer and then, as their cars sat side by side, even spoke to Grayer, informing him that she had witnessed the carjacking and urging him to pull over.[5] Mencer's focused attention during the incident buttresses the judgment to credit her identification of Grayer as reliable.

Under *Biggers* factor four, Mencer never wavered in identifying Grayer throughout the proceedings. She testified that her identification of him at the live lineup was made independently of the photo array, as Grayer's facial appearance had significantly changed by the time of the live lineup—he had more hair and facial hair—and thus the photos did not aid her at the live lineup. Yet even with Grayer's different facial appearance from that of the photos, Mencer, without hesitating, picked him out of the live lineup. *See Ledbetter*, 35 F.3d at 1072-73 (witness noted differences in facial hair between two arrays and quickly and accurately identified suspect at second array).

---

[5]The concurrence, on the other hand, describes Mencer as "somewhat agitated" during the chase, because "she was yelling at others during the pursuit and hollering at the carjacker while they were stopped at the red light." Mencer screamed not in fear or in a way that might distract her—she yelled to get Grayer's attention and to urge him to pull over. The trial court properly assessed Mencer's demeanor—"She was an eye witness and she took it upon herself freely and voluntarily to go chasing after this person. And that I think does away with the emotions that might cause for misperception. She obviously didn't feel threatened because if she did she wouldn't have been doing what she was doing."

And under factor five, the length of time between Mencer's initial observation and her later identifications of Grayer was not so long as to create a risk of an erroneous identification. Mencer viewed the photos about a month after the incident; she viewed the live lineup another month later; and she identified Grayer in court about a year after the carjacking. Courts have found similar time lines as not creating a risk of misidentification under *Biggers* factor five. *See, e.g., Howard,* 405 F.3d at 473 (three months between initial observation and first identification). *See also Hill*, 967 F.2d at 233 (five-year delay did not render identification unreliable in light of totality of the circumstances); *United States v. Hmeidan*, No. 97-3291, 1998 WL 553154, at *3 (6th Cir. Aug. 20, 1998) (per curiam) (three-year delay between observation and in-court identification permissible where witness expressed certainty throughout proceedings).

Our independent analysis of the *Biggers* factors here leads us to conclude that the Michigan court did not unreasonably apply them in deeming Mencer's identification reliable.

## B. Jury Instruction

Grayer next contends the trial court erred in instructing the jury concerning Mencer's photo identification: "I'm instructing you that that procedure is permissible under Michigan law." According to Grayer, that instruction "so infected the entire trial that the resulting conviction violate[d] due process."

The state appellate court reviewed this claim for plain error, as Grayer failed to object to the instruction at trial. The court found error—the photo array, though not offending due process, violated Michigan law, which requires counsel's presence at the photographic lineup when a

9

defendant is in custody, *see People v. Kurylczyk*, 505 N.W.2d 528, 534 (Mich. 1993)—but no prejudice "because the jury retained its ability to assess the reliability and accuracy of the witness' subsequent identifications." *Grayer*, 2001 WL 740581, at *4.

Grayer's claim is procedurally defaulted in light of the state court's failure to notice the plain error. A procedural default occurs when a state procedure bars a petitioner's claim and the state court "clearly and expressly" relied on that bar. *Harris v. Reed*, 489 U.S. 255, 263 (1989). Under Michigan law, failure to make a contemporaneous objection serves as an independent and adequate state-law bar. *People v. Kennebrew*, 560 N.W.2d 354, 357-58 (Mich. Ct. App. 1996). And a court's decision to not review such a claim, for lack of plain error, amounts to the enforcement of that procedural bar. *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001) ("[W]e view a state appellate court's review for plain error as the enforcement of a procedural default.") Thus, the state court's express finding of no plain error, due to Grayer's failure to demonstrate prejudice, serves here as a procedural bar to Grayer's jury-instruction claim.

The district court, however, declined to find procedural default, reasoning that the Michigan court "found the trial court's instruction constituted plain error and went on to consider the effect of the error upon the Petitioner's trial." In other words, according to the district court, the state court's prejudice analysis amounted to a consideration of Grayer's claim on the merits.

That decision is premised on a misreading of the state court's opinion. The Michigan court's analysis of the error's impact on the trial was part of its plain-error review. Under Michigan law, as under federal law, prejudice comprises part of the plain-error test. *See People v. Carines*, 597 N.W.2d 130, 138-39 (Mich. 1999) (adopting *Olano* standard, which requires a showing of

10

prejudice). Indeed, the state court began its analysis by noting that "the defendant must demonstrate plain error *that was prejudicial*, i.e., that could have affected the outcome of the trial." *Grayer*, 2001 WL 740581, at \*3 (emphasis added). The state court then "clearly and expressly" rejected Grayer's claim under the plain-error standard, citing two Michigan plain-error cases and holding that his "substantial rights" were not affected and the "error was not so prejudicial that it affected the outcome of the trial." *Id.* at \*4. This resulted in procedural default, and Grayer has not demonstrated any cause or prejudice to excuse the default. *See United States v. Saro*, 24 F.3d 283, 287 (D.C. Cir. 1994) ("The Supreme Court has declared that the showing of 'prejudice' necessary under the 'cause and prejudice' standard of habeas law 'is significantly greater' than that necessary under the plain-error doctrine.") (citing *Murray v. Carrier*, 477 U.S. 478, 494 (1986)).

## C. Double Jeopardy

Grayer contends that carjacking and armed robbery constitute the "same offense" and thus his conviction for both crimes amounts to double jeopardy. He claims that the two crimes contain identical elements and, in this case, concerned the same conduct—Grayer's theft of the car. The Michigan Court of Appeals rejected this argument, finding that under *Blockburger v. United States*, 284 U.S. 299 (1932), the two offenses each contain a different element, thereby eliminating any double jeopardy problem. Further, the court found that because the Michigan legislature intended cumulative punishment for the same offense under two different statutes, no double jeopardy violation occurred.

Nothing unreasonable is evident in the Michigan court's application of Supreme Court precedent in assessing this claim. The Supreme Court holds "where the same act or transaction

11

constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." *Blockburger*, 284 U.S. at 304. Under the *Blockburger* test then, if each offense contains a different element, no double jeopardy violation arises. *Brown v. Ohio*, 432 U.S. 161, 166 (1977).

Evaluating carjacking under Mich. Comp. Laws § 750.529a and armed robbery under § 750.529, Grayer's conviction of both offenses does not result in double jeopardy because carjacking requires a motor vehicle as the object, while armed robbery does not, and armed robbery requires use of a dangerous weapon, while carjacking does not.[6] Michigan courts have, in fact, rejected this precise claim many times;[7] the Michigan court here correctly followed suit.

### D. Malicious Prosecution

Grayer arguably raised a malicious-prosecution claim in his habeas petition, alleging that he "should have only been charged with Receiving and Concealing stolen property." Liberally construing this allegation, Grayer seems to argue that the prosecutor violated his constitutional rights

---

[6]Armed robbery sometimes requires proof of a motor vehicle, when, of course, the object stolen is the motor vehicle. In this case, however, the state charged Grayer with armed robbery for stealing the victim's purse and cell phone, not the car. *See Grayer*, 2001 WL 740581, at *5 n.4 ("The prosecution amended the information at the end of trial to identify the purse and cell phone as the property forming the basis of the armed robbery conviction.").

[7]*See, e.g., People v. Parker*, 584 N.W.2d 336, 340 (Mich. Ct. App. 1998); *People v. Henderson*, No. 250156, 2005 WL 321004, at *2 (Mich. Ct. App. Feb. 10, 2005) (per curiam); *People v. Lollio*, No. 241431, 2003 WL 22399294, at *2 (Mich. Ct. App. Oct. 21, 2003) (per curiam); *People v. Sims*, No. 234934, 2002 WL 31380801 (Mich. Ct. App. Oct. 22, 2002) (per curiam).

12

by overcharging him for carjacking and armed robbery. Grayer, however, failed to exhaust this claim in the Michigan state courts. Nonetheless, rather than remand this case and order dismissal on the ground that Grayer filed a mixed petition, *see Rose v. Lundy*, 455 U.S. 509, 522 (1982), this court considers and rejects this argument on the merits, *see* 28 U.S.C. § 2254(b)(2) (1996).

To establish a constitutional violation for malicious prosecution, Grayer must demonstrate, at a minimum, a lack of probable cause for the state to prosecute him for carjacking and armed robbery. *See Darrah v. City of Oak Park*, 255 F.3d 301, 312 (6th Cir. 2001). Because the jury convicted Grayer of both offenses, probable cause clearly supported the charges. *See Stanley v. City of Norton*, 124 Fed. Appx. 305, 310 (6th Cir. 2005) (finding probable cause, established by grand jury indictment, defeated malicious-prosecution claim). Thus, his claim fails on the merits.

III

We affirm.

GWIN, District Judge, concurring in judgment. MOORE, Circuit Judge, joins this opinion, making it the opinion of the court.

I concur in judgment in the opinion denying Grayer's writ of habeas corpus. I write separately to discuss my concerns with the identification issue presented in this case. The issue is whether the Michigan Court of Appeals' decision -- that Mencer's identifications were independently reliable -- constitutes an unreasonable application of established precedent under AEDPA. In the end, I believe that this is a very close question. Mencer's photographic identification was unquestionably suggestive. As to reliability, I disagree with the lead opinion's analysis, which gives short shrift to the *Biggers* factors that undermine the reliability of Mencer's identification. In contrast to the lead opinion, I believe that the first and third factors undermine reliability. However, because of the strict AEDPA standards, I conclude that it was not objectively unreasonable for the Michigan Court of Appeals to find that the admission of Mencer's identification testimony was nonetheless independently reliable.

## I. BACKGROUND

About one month after the carjacking, Parole Officer Junkin showed Jane Mencer two photographs. Both photographs were of Grayer. Both were dated September 30, 1993 and had alias names of Grayer on the photographs. Both photographs had captions saying, "Michigan Department of Corrections."

At trial, Grayer's sole defense was that of misidentification, contending that Mencer mistakenly identified Grayer as the carjacker and that Mencer's viewing the two photographs of

14

Grayer tainted her subsequent identifications. During his opening statement, counsel for Grayer argued that "the power of suggestion is great," referring to Junkin showing Mencer two photographs of Grayer. Counsel for Grayer continued, "Ms. Mencer, before identifying my client, had an opportunity to discuss this . . . with one other person and look at one photograph, and that photograph being of my client, Mr. Grayer."

At trial, the victim did not identify Grayer as the carjacker. Nor could the victim identify the knife as the one used during the attack.

Mencer testified at trial. She was the only witness who identified Grayer as the carjacker because the victim could not make the identification.

## II. DISCUSSION

*A. Suggestiveness*

The pre-trial photographic procedure in showing Mencer only two photographs, when both photographs were of Defendant Grayer, was impermissibly suggestive. The Supreme Court has long cautioned against photographic identifications in which the police display only one photograph. *See Simmons v. United States*, 390 U.S. 377, 383 (1968) ("This danger [that the witness may make an incorrect identification] will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw.").

The remaining issue is whether Mencer's subsequent identifications were otherwise reliable, meaning that her identifications were reliable independent of the impermissibly suggestive pre-trial

15

photographic procedure. If Mencer's identifications are reliable, they will be admissible even though the photographic procedure was suggestive. *See Manson v. Braithwaite*, 432 U.S. 98, 114 (1977); *Carter v. Bell*, 218 F.3d 581, 605 (6th Cir. 2000).

### B. Reliability

In judging reliability, we consider the totality of the circumstances, including the factors described in *Manson* and *Biggers*: (1) the opportunity of the witness to view the defendant at the initial observation; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the defendant; (4) the level of certainty shown by the witness at the pretrial identification; and (5) the length of time between the initial observation and the identification. *Manson*, 432 U.S. at 114; *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). We weigh these factors against any "corrupting effect of the suggestive identification," which suggests that the factors should weigh more in favor of reliability when the witness views an extremely suggestive a pre-trial photographic procedure. *Manson*, 432 U.S. at 114. In conducting this analysis, I am mindful that "[s]ocial-science research has demonstrated the unreliability of an identification made after the display of a single photograph." Connie Mayer, *Due Process Challenges to Eyewitness Identification Based on Pretrial Photographic Arrays*, 13 Pace L. Rev. 815, 828-29 (1994).

In applying the *Biggers* factors, the lead opinion concludes that the first, second, fourth, and fifth factors "clearly demonstrate a reliable and independent identification." The lead opinion admits that the third factor undermines reliability, but finds that this factor alone does not "render an identification unreliable."

16

I write separately because I disagree with the lead opinion's analysis of the *Biggers* factors. I believe that the first and third *Biggers* factors undermine the reliability of Mencer's identification, and I have concerns about the reliability of Mencer's identification. However, after considering AEDPA as it applies to this habeas petitions, I find the Michigan Court of Appeals' conclusion was not objectively unreasonable.

*1. Opportunity to View*

As to the first factor, the lead opinion concluded that this factor supports reliability because "Mencer had the opportunity to view Grayer's profile and face for one to two minutes at the red light." After reviewing the record, I find insufficient support for this finding. After considering the time of day, the ability to see only the carjacker's profile except for a short frontal view, the distance between the cars, the need to view through the interior length of the carjacked car, I conclude that Mercer did not have a good opportunity to view the carjacker under the circumstances of the car chase.

Mencer, a fifty-one year old woman, was driving a 1996 Grand Prix. Mencer did not see the carjacker until after he was seated in the Neon. During most of the pursuit, Mencer viewed the carjacker from behind since her car was trailing his. While she pursued him, she was behind him, and she could, at best, see the back of his head.

Mencer's only opportunity to view the carjacker, either his face or his profile, occurred while they were stopped at a red light, and Mencer was to the right of the carjacker. But even while they were stopped at a red light, in looking at the carjacker, Mencer needed to look through the length

17

of the carjacked vehicle (hard-top, like hers) to observe the offender. Mencer viewed the carjacker on an early September evening after 7:45, across the distance separating the cars and through the interior of the Neon.

The lead opinion suggests that Mencer viewed the carjacker's face and profile for several minutes.[1] However, the record instead shows that she observed his profile for several minutes, but that she saw his face only once when the carjacker looked at her. Mencer testified that "[a]t one point" he looked at her and she saw his face, but otherwise he looked straight ahead and she saw his profile. While the record does not include how much time the carjacker looked at Mencer, her testimony suggests that it was rather short, as he only looked at her once while they were stopped at the red light. At most, Mencer viewed his face for only a short period.

Mencer testified regarding the clothes that the carjacker was wearing. The lead opinion credits Mencer's statement that she could "look right down and look at the clothing" because her "car was bigger than that car" during the pursuit. Although the lead opinion accepted Mencer's assertion that she could see the carjacker's face and body because her car was higher than the Neon, both Mencer and the carjacker were driving sedans, and they would have been at approximately the same level. Given that she only saw him while he was seated in the car, it is not clear how she estimated that he was 5'9" - 5'10". From Mencer's vantage point, it is implausible that Mencer could have seen the pants that the carjacker was wearing. It is also unlikely that she could see the stripes

_____

[1] For example, the lead opinion states that "Mencer examined Grayer's face for one to two minutes as their cars sat side by side." At best, this sentence is misleading -- it fails to distinguish the several minutes when Mencer observed the carjacker's profile from the brief moment in which Mencer observed the carjacker's face.

18

on the left sleeve of his jacket since she was following behind him during the chase and her car was to the right of the Neon when they were stopped at the red light.

Based upon the circumstances, the record shows that, on the whole, Mencer did not have a good opportunity to view the carjacker, which weighs against the reliability of the identification.

*2. Whether the Witness was Attentive*

As to the second factor, the lead opinion finds that Mencer had a "high degree of attention." Although some circumstances undermine Mencer's reliability, I agree that Mencer had a high degree of attentiveness for the brief time when she looked at the carjacker while she was stopped at the red light.

In this case, Mencer's testimony suggests that she had a high degree of attentiveness for the brief time when she looked at the carjacker while she was stopped at the red light. Mencer testified that "I looked at him very well when was inside of the Neon. I purposely looked to see what I could remember about him. That's exactly the way I did it in case that I see him again." Mencer suggests that she was very attentive, which tends to support reliability. Although attentive, Mencer had little chance to observe the perpetrator during the pursuit.

Mencer did not witness the carjacking itself. Instead, her attention was focused on Trecha running from the car. However, she suspected that Trecha was carjacked, and she pursued the suspected carjacker with a reason to pay attention, even though she did not witness the crime itself. Mencer's pursuit of the carjacker was her only encounter with the carjacker.

19

During the pursuit, Mencer pursued the carjacker in her car for five or six miles, sometimes at speeds up to forty-five miles per hour. During the pursuit, Mencer largely drove behind the Neon and only came close to the Neon when they were stopped at the red light, and she was still a car length's distance away. At the red light, Mencer closely focused on the carjacker although he mostly looked straight ahead.

The lead opinion concludes that "Mencer did not suffer from fear or stress during this incident, as crime victims and witnesses often do." However, Mencer's testimony suggests that she was somewhat agitated while she was pursuing him. For example, she testified that she was yelling at others during the pursuit and hollering at the carjacker while they were stopped at the red light.

Although some circumstances suggest that she was distracted, we conclude that Mencer displayed a high level of attentiveness during her opportunity to view the carjacker, which generally supports reliability of her identification.

*3. Accuracy of the Witness's Prior Description*

As to the third factor, the lead opinion admits that Mencer's prior description was inaccurate, but concludes that the inaccuracies do not "necessarily render an identification unreliable." I agree that Mencer's prior description is somewhat inconsistent with Grayer's physical attributes. Although these inconsistencies were not major, the inconsistencies further undermine the reliability of Mencer's identification, especially since Mencer did not have a good opportunity to view the carjacker.

In her description to the police, Mencer described the carjacker's height, age, complexion, hair, facial hair, clothing, and build. Mencer's description was somewhat inconsistent with Grayer's physical attributes. For example, Grayer is actually 5'6", even though Mencer described the suspect as 5'9" to 5'10". Grayer was 28, although Mencer described him as 20-25. Although both Mencer and the victim described the carjacker as having a "thin build," Grayer's basic information sheet describes him as having a medium build. Additionally, Mencer's described the carjacker as being "dark skinned," but Grayer's basic information sheet describes him as having a medium complexion. Finally, Mencer's description of the carjacker's facial hair was inconsistent with Grayer's facial hair. In her description to the police, Mencer stated that the carjacker had a beard. At the *Wade* hearing, she testified that Grayer's "facial hair was big, it was grown out more." However, the police record from the live lineup describes Grayer as only having a mustache and goatee. Mencer also described the clothing that the carjacker was wearing, although it is not clear how she was able to view the pants that he was wearing since she only saw him while he was seated in the automobile.

Elsewhere, the lead opinion emphasizes that Mencer's description of the carjacker was similar to the victim's description. However, the record shows that the victim was unable to identify the carjacker.[2]

---

[2] At trial, the victim stated, "once I saw the knife, I never looked at him again." In describing her attacker, the victim indicated that "I had just impressions because I had not deliberately looked at the man." She described the man as a black male about twenty years old, 5'8" tall with a thin build, medium complexion, with short curly hair, and he had a beard as if he had not shaved for a day or two. However, the victim never had a front view of the suspect, and she did not look at him again after he brandished the knife.

The inconsistencies between Mencer's description and Grayer's physical attributes suggests that Mencer's prior description was at least partially inaccurate. This further undermines the reliability of Mencer's identification.

*4. Level of Certainty*

As to the fourth factor, the lead opinion concluded that Mencer's identification was made with certainty. I agree with this conclusion as to this factor. However, I disagree with the lead opinion's statement that Mencer's identification at the live lineup was made independently of the photo array. This statement assumes the question at issue in the *Biggers* analysis, namely whether Mencer's identifications were independently reliable from the impermissibly suggestive pre-trial photographic procedure.

Although level of certainty is a factor in determining reliability of an identification, courts proceed with caution once a witness has seen a single photograph of a suspect. The Supreme Court has observed that, after viewing a single photograph, "the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent line-up or courtroom identification." *Simmons v. United States*, 390 U.S. 377, 383-84 (1973). Other courts have recognized that "[d]eterminations of the reliability suggested by a witness's certainty after the use of suggestive procedures are complicated by the possibility that the certainty may reflect the corrupting effect of the suggestive procedures." *United States ex rel. Kosik v. Napoli*, 814 F.2d 1151, 1159 (7th Cir. 1987). A defendant's right to due process includes the "right to avoid having suggestive methods transform [an identification] that was only tentative into one that is positively certain." *Solomon v. Smith*, 645 F.2d 1179, 1185 (2d Cir.

22

1981).  Although the level of certainty is a *Biggers* factor,"[m]any [social science] studies demonstrate that there is no correlation between the confidence of the witness and the accuracy of the identification."  Connie Mayer, *Due Process Challenges to Eyewitness Identification Based on Pretrial Photographic Arrays*, 13 Pace L. Rev. 815, 845 (1994).

Keeping these considerations in mind, Mencer exhibited a high level of certainty, which, under established precedent, supports the reliability of her identifications.

*5. Length of Time*

Under the fifth factor, the lead opinion concluded that the length of time between the initial observation and Mencer's identifications "was not so long to create a risk of erroneous identification."  I agree with the lead opinion that this factor supports reliability of Mencer's identification because the time elapsed in this case was no more than several months.

*C. AEDPA*

Before the state courts, Grayer made the argument that the identification methods were constitutionally impermissible.  The Michigan Court of Appeals denied the assignment of error and affirmed Grayer's convictions.

Where a state court adjudicates a petitioner's constitutional claim on the merits, AEDPA governs subsequent federal habeas actions.  *E.g., Smith v. Stegall*, 385 F.3d 993, 997-98 (6th Cir. 2004), *cert. denied*, 161 L. Ed. 2d 1094 (2005).  Here, Grayer does not contend that the Michigan Court of Appeals used a standard of law contrary to established Federal law, as determined by the

Supreme Court. Instead, Petitioner Grayer maintains that the Michigan court unreasonably applied controlling federal law. An "unreasonable application" occurs when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000).

A state adjudication is not "unreasonable" "simply because [a federal habeas court] concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. Instead, the petitioner must show that the state court's application of established Supreme Court precedent was objectively unreasonable. *E.g., Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam).

In this case, the pre-trial photographic procedure, in showing Mencer two photographs of Grayer, was suggestive. Some of the *Biggers* factors undercut the reliability of the identification while others support it. The Michigan court faced a close question. Taken as a whole and mindful that in undertaking habeas review, AEDPA requires us to afford wide latitude for the state court's determinations on the merits, I find the state court's determination was not unreasonable.

Accordingly, I conclude that the Michigan Court of Appeals' decision finding that Mencer's subsequent identifications were independently reliable was neither contrary to nor involved an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d). For the foregoing reasons, I concur in judgment.

Judge Moore joins this opinion, making it the opinion of the court.

24